**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| v. | * | **CRIMINAL NO.   GJH 17 0667** |
| | * | |
| **CLIFTON MOSLEY,** | * | |
| **Defendant.** | * | |
| | * | |

_____

**GOVERNMENT'S RESPONSE TO DEFENDANT MOSLEY'S**
**PRETRIAL MOTION TO SEVER**
**AND MOTION TO FILE OUT OF TIME[1]**

The United States of America submits this response in opposition to the defendant's Motion to Sever (ECF 82).

## I.     POSTURE OF CASE

On December 19, 2017, a Maryland federal grand jury returned an Indictment charging Davon Carter with: Conspiracy to Murder a Witness (Retaliation), 18 U.S.C. §1513(f); Witness Retaliation Murder, 18 U.S.C. §1513(a)(1)(B); Conspiracy to Murder a Witness (Tampering), 18 U.S.C. §1512(k); Witness Tampering Murder, 18 U.S.C. § 1512(a)(1)(A); Felon in Possession of Ammunition, 18 U.S.C. §922(g); and Possession with Intent to Distribute Marijuana, 21 U.S.C. §841.   The grand jury voted additional drug trafficking charges as to Carter and returned a superseding indictment on January 29, 2019 (ECF 48) (Counts Six through Nine).

The grand jury returned a Second Superseding Indictment, adding defendant Mosley ("Mosley") on March 5, 2019 (ECF 54).   Mosley was charged in Count One through Four with

---

[1] The government mistakenly wrote the response date for this motion as July 29.   July 29 was actually the Reply date for defense counsel. The government apologizes for the error. The government realized the error when seeking defense counsel's permission for "an extra day" to file this Response.   The government respectfully seeks the Court's permission to file this late Response and notes counsel's courtesy in consenting to this relief.

Carter regarding the murder of Latrina Ashburne.   Mosley is also charged in Count Ten with distribution of marijuana.

## II.      FACTUAL BACKGROUND

### A. The Murder of Latrina Ashburne

On May 27, 2016 at approximately 7:20 a.m., Latrina Ashburne was shot and killed in front of her home on Rosalind Ave in Baltimore City (hereinafter "Ashburne murder").    Ms. Ashburne was the next-door neighbor of a material witness in what was then an upcoming federal trial set for September 2016 against "MH."   MH was under indictment for both health care fraud charges and extortion charges related to his role in another murder (the September 2013 murder of David Wutoh, hereinafter "Wutoh murder"). As part of the discovery process, the government disclosed a federal witness's name (the original "whistleblower" in the health care fraud case) to all counsel in the health care fraud case.

Ms. Ashburne was similar in age, height and complexion to the intended victim.   Ms. Ashburne was a teacher's assistant and worked with her pastor at a local church. According to an eyewitness (who called 911), she was driving home from taking her child to school when she saw a man confront Ashburne coming out of her home and then heard one gunshot and saw Ms. Ashburne collapse.    The shooter ran.   As his back was to her, the witness did not see the shooter's face.   The shooter did not rob Ashburne.   The medical examiner recovered one jacketed bullet in Ms. Ashburne's lung.

Surveillance camera video retrieved from the area near the scene of the murder revealed the shooter fleeing the scene on foot as depicted by a maroon line below.   Within moments of the shooter passing through a nearby parking lot (marked with a red star below), the camera captured a 2005 Pontiac Grand Am bearing Maryland tag #4BXC31 (hereinafter "Pontiac").    It

is readily apparent the Pontiac was there to pick up the shooter but misses him by approximately 8 seconds.    Footage follows where the Pontiac appears to be waiting for the shooter then searches for the shooter in the vicinity where he fled.    Footage also captured the Pontiac at approximately 6:36 a.m. (45 minutes before the murder) in the same vicinity as depicted with a blue star below.[2]



Though the shooter was wearing a hood covering his face, Carter looks similar to the shooter[3] captured in the video.

---

[2]  According to his cell site records, Carter was mobile between 6:04 a.m. and 6:13 a.m. Travel time from his home to starred area is approximately 20 minutes, a fact that is consistent with the arrival time at 6:36 a.m. in the area.

[3]    At least one witness will identify Carter from the video.

In the footage, the man is running as if carrying/concealing the gun in his left hand and in a way to hide a sleeve of tattoos on both arms.   It also appears that the man is cradling his right arm/hand as if injured and at times seems to limp when he runs/walks.[4]



BPD traced the Pontiac to the mother of Carter's girlfriend, thereby establishing MH's connection to the homicide because Carter was a longtime associate of MH's (among other things, the two sold marijuana together).   The surveillance camera videos also captured a silver Audi with a distinctive long and narrow front license plate.   MH owned a silver Audi with a distinctive long and narrow front license plate.   The Audi was in the area near the scene of the murder both before and afterwards.

In the course of the investigation, the Government confirmed Mosley was the driver of

---

[4]   On May 23, 2016, Carter told MH in a jail call that he "fell on my right wrist. When I fell, my right leg, I did like a spread eagle, almost the splits for real. I fell on my wrist and fucked my wrist up. I got torn ligaments in my wrist, my back, I got two (unintelligible) discs in my back um my necks fucked up and my shoulder's still fucked up."   Carter told a friend on April 15, 2016 that he slipped on some ice and "fuck my wrist and back up" and on May 23, 2016 he discussed an upcoming doctor's appointment and court in a recorded jail call.

the Audi, another longtime associate of MH's and the only person in communication with Carter's flip phone the early morning hours of the murder.   MH owned the Audi and allowed both Carter and Mosley to drive it when he went to jail in May 2016.

Cell Site Location Information (referred to herein as "CSLI") show that two of Mosley and Carter's phones were in contact beginning at around 6:15 a.m., leaving their respective homes and heading toward the vicinity of the murder.   Mosley's cell phone data puts him in the area where a camera first captures the Audi.   By late morning, Carter was leaving the Maryland area heading toward Myrtle Beach in the silver Audi.

B. **Baltimore Police Activity on June 1**

Four days after the murder, on June 1, 2016, BPD homicide went looking for the Pontiac at Lawson's apartment building.   As police pulled up in an unmarked car, they saw the Pontiac (for which they had a state warrant to search). They next Carter coming out of the building that housed Lawson's apartment.   BPD conducted a traffic stop and recovered approximately 2 pounds of marijuana and over $7,000 cash and various paraphernalia.   Detectives transported Carter to the city for interviews.   There are no *Bruton* issues with regard to Carter in his interview because, notably, he never mentions his communications with Mosley. He does, however, provide false information including his whereabouts as does Mosley (discussed *infra.*)

On June 1, 2016, we obtained federal warrants to search a Toyota belonging to Carter, the BMW and Carter's home.   Law enforcement recovered the license plate tag to the Audi in the BMW.   At the time of Carter's interview with City police, he was in possession of three phones, two of which were "flip" phones – i.e., small relatively unsophisticated phones without any internet capability.[5]   City detectives obtained a search and seizure warrant for the phones.

---

[5] DOJ examiners did not forensically examine Carter's iPhone, 443-293-2399 (2399) until November 22, 2017 when they were able to break his passcode.

There were very few contacts on the two flip phones, but one phone (the "7626 number")
contained an entry for "Cliff" and the number 410-693-1533 (one of Mosley's two phones).
Mosley and Carter communicated the morning of the murder using 7626 (Carter) and 1533
(Mosley).

### C.  Motive for Murder

Mosley and Carter's friend, MH, had a clear motive to kill the intended victim. The grand
jury first indicted MH on health care fraud charges on June 3, 2015 based on his employment at
a medical supply company doing business as RXRS.   MH was released on conditions to include
24/7 electronic home monitoring.   Thousands of pages of discovery produced to counsel on July
2, 2015 first contained the name of the federal witness (the intended victim) and a memorandum
of interview containing the information the witness had regarding the Wutoh murder.   The
memorandum (referred to herein as the "Memo") summarized direct information about MH's
knowledge of the fraud and extortion scheme and threats. In fact, during the Wutoh
investigation, on April 15, 2013 when Carter was in jail, and MH (then on the street) discussed
the intended victim's knowledge and disapproval of the fraud that was going on at the company
and the fact that the witness had confronted MH about it.   Carter observed, "Dang she seem like
she gon', she a go tell someone, get some people caught up."

After his June 2015 indictment, MH was very concerned he would go to jail.   On several
occasions between September 2015 and May 2016, the government attempted to have MH
detained for various violations.    For example, on November 21, 2015, MH received a speeding
ticket.    Judge Coulson scheduled a bail review hearing.   MH sent a text: "The court hearing is
heavy on my mind" and "I'm worried about the outcome."   MH remained on release.

On January 27, 2016, Pretrial Services filed a Notice of Violation report (but
recommending MH remain on release).   Still, the Report detailed various curfew violations and

a speeding ticket MH had not reported.    On February 1, 2017, at 11:37 a.m., MH spoke to his

attorney.   At 2:50 a.m. on February 2, MH texted his girlfriend that "Davon and Cliff …. come

through they all just left."

The grand jury was actively investigating the Wutoh murder against MH in January

through April 2016 and MH became aware of the new turn the health care fraud investigation

had taken.   Specifically, on February 23, 2016, a friend ("D") testified before the grand jury.

According to "D," after he received the subpoena on February 3, 2016, he immediately called

MH and discussed how "D" would be "questioned" by the grand jury.   MH told him, among

other things, that "other people was rounded up and questioned too" and MH provided the name

of another individual who had testified before the grand jury.

On March 20, 2016, while MH was still not detained, he texted his girlfriend:

"Everything s ok boo I gotta see cliff" and "I guess I made my own bed." CSLI puts MH near the

scene of the murder at that time.   Later that night, he texted:   "Boo im sorry u dont understand

why but I know you know why if you calm down and think for a min I had to get some things in

motion and I know this is not what you're used to."

On April 18, 2016, the government extended a plea offer to MH's co-defendant in the

health care fraud case.   The statement of facts disclosed information (but not the name) provided

by a witness as to what the witness would testify to regarding "secret deliveries" by MH in the

health care fraud case.   MH referenced the information he had learned in a subsequent jail call.

On April 29, 2016, the government unsealed the second superseding indictment in the

MH matter (returned by the grand jury on April 19 but under seal pending return of the

aforementioned discovery). The indictment charged MH and others with the extortion of David

Wutoh resulting in Wutoh's murder. On Friday, April 29, at 9:26 a.m., the government filed a

Motion to Revoke MH's Release conditions because of the new charges and MH's prohibited

contacts with grand jury witnesses during the investigation.     Counsel for MH did not appear to receive the motion until Monday morning, May 2, at 9:03 a.m. when he responded he was not available until May 4 for the hearing and formally responded to the revocation motion on May 3 at 11:54 a.m.

Judge Coulson detained MH at the May 4 hearing pending a full hearing on May 6. Judge Coulson entered an Order of Detention at that time.   MH has been in jail since May 4, 2016.

On May 7, 2016, at 11:45 a.m., MH called his girlfriend and asked her to get him "Davon's number and C's (Cliff) number."   He also wanted Davon to send him some money and get some materials for him to write letters on.   On May 7, at 6:12 p.m., MH called his girlfriend who advised him to be cautious about his words:   "you know the prosecutor lady is listening to the whole thing."

### D.  MOSLEY AS CO-CONSPIRATOR (PHONE ANALYSIS/LOCATION DATA/VIDEO SURVEILLANCE

Because the evidence establishes that Carter is the shooter, the evidence will show that Mosley was waiting to pick him up in the Pontiac in the back parking lot discussed above.

There are three telephone contacts between Carter and Mosley the night before the murder (9:13 p.m., 9:24 p.m. and 10:04 p.m.).   The calling patterns of both men the morning of May 27 shows that they were only speaking with each other and ignoring the repeated calls of their girlfriends from the time they left their houses until after the murder.     Mosley did not return his girlfriend's call until 8:24 a.m.   Similarly, Carter went back to his house and retrieved his 2399 phone – returning Lawson's call at 9:25 a.m.

CSLI establishes that both men left their respective homes at approximately the same time that morning and headed to the vicinity of Rosalind Avenue.



Carter's 7626 number began moving away from his home in Parkville at 6:04 a.m.   Carter called

Mosley (on 1533) at 6:04 a.m., and again at 6:13 a.m. and 6:15 a.m. Mosley's phone similarly

shows him leaving the residence he shared with his girlfriend.   Mosley's phone began hitting in

the area of the murder based on a call from Carter's 7626 as early as 6:15 a.m.



At 6:14 a.m. various cameras captured the Silver Audi (MH's car with the long European

tag).   Per his own admissions and the cell tower records, Mosely is driving the Audi that

morning at that time.   At 6:15 a.m., the Audi is in motion.   As depicted by the red arrow below, at 6:17 a.m. additional footage captures the Audi returning down Woodland and making a right on to Nurton (the direction the Audi had just come from) and a different camera angle captures the Audi taking a right on to Rosalind, approximately one block from the murder scene.



The cameras first pick up Carter's Pontiac at 6:36 a.m. coming down Rosalind and taking a left onto Nurton and then a left onto Woodland.   Neither the Audi nor the Pontiac are seen on camera again until 45 minutes later at approximately 7:21 a.m. when the Pontiac is captured just after the shooter flees from the scene (passing a parking lot off of Virginia Avenue), crossing Virginia Avenue (which runs parallel to the south of Rosalind), and Lanier Avenue until he is off screen.   The Pontiac pulls up into the Virginia Avenue parking lot where a camera clearly captures the Pontiac's tag (ARROW IN RED BELOW) as the car appears to wait for the shooter (DIRECTION INDICATED BY YELLOW ARROW BELOW) who passed through 8 seconds before.   The Pontiac is in the Virginia Avenue parking lot for approximately two minutes before it leaves but takes a right onto Virginia (rather than down Lanier where the shooter had fled).



Beginning at 7:20 a.m., Mosley's girlfriend begins calling him repeatedly – 12 times between 7:20 a.m. and 7:23 a.m. looking for him.   Mosley did not answer the phone.   She alternatively called both the 1533 and 2650 numbers.   Both Mosley phones are in the coverage area of the murder.

Like Carter, Mosley and MH were longtime friends, having met in prison, a fact the government will seek to elicit at trial under Rule 404(b).   Carter and Mosley, on the other hand, were only associates through MH yet in regular contact while Hightower was in jail.

**E.  Jail Calls after the Murder**

Prison officials searched MH's jail cell after identifying the Pontiac, and making a connection between the murder and MH.   At 5:35 p.m. on May 27, MH called his girlfriend and she made a three way call to Carter:

| | |
|---|---|
| **5:03** | |
| HIGHTOWER | I WANT YOU TO HOLLA AT "D" AND SHIT THO, FOR REAL |
| A. WASHINGTON | OK, ALRIGHT |
| HIGHTOWER | OK. AND THEN HOLLA AT THE OTHER ONE. YOU HEARD ME? BOO? HELLO HELLO |
| A. WASHINGTON | HELLO. |
| HIGHTOWER | HELLO |
| A. WASHINGTON | I WAS CALLING... |
| CARTER | WHAT'S UP MAN. HOW YOU DOING TODAY MAN? |
| HIGHTOWER | ALL RIGHT, ALL RIGHT MAN GOOD. I WAS JUST MAKING SURE EVERYTHING WAS GOOD AND SHIT MAN ..IT'S JUST. |
| CARTER | YEAH YOU KNOW, UM |
| HIGHTOWER | MUTHA FUCKAS HARASSING ME AND SHIT. I WAS JUST LIKE, I SAID I DON'T KNOW, I GOTTA CALL AND MAKE SURE EVERYBODY GOOD, MAN. |
| CARTER | WHAT'S WRONG? |
| HIGHTOWER | THEY CAME AND SHOOK MY CELL DOWN AND TOOK ALL MY PAPERS OUT OF IT. I DON'T KNOW, I THINK |
| CARTER | DAMN, THAT'S CRAZY |
| HIGHTOWER | THEY WANTED MY PHONE NUMBERS OR SOMETHING TRYING TO SEE WHO I REACH OUT TO. I DON'T KNOW WHAT THE FUCK IT IS. THEY TOOK COPIES MY EVERY PIECE OF PAPER IN MY CELL. THEY TOOK EVERYTHING OUT MY CELL |
| CARTER | THAT'S CRAZY YO |
| HIGHTOWER | RIGHT. THEY HAD AN INTEL OFFICER COME IN THERE. LIKE I WAS CHILLING AT COUNT TIME. IM IN THE CELL JUST WATCHING TV MINDING MY BUSINESS. THEY'RE LIKE MR. HIGHTOWER COME CUFF UP. AND IM LIKE WHAT. THEY CALL ME TO THE DOOR AND PUT THE CUFFS ON ME AND SHIT. THEN THEY OPEN MY DOOR, LIKE... THEY WAS IKE I NEED EVERY PIECE OF PAPER OUT OF YOUR CELL. I'M LIKE WHAT . I WAS LIKE MAN. I WAS PISSED OFF AT FIRST BUT I KNOW THEY JUST GONNA KEEP HARASSING A NIGGA MAN |
| CARTER | YEAH. IM DRIVING DOWN TO UM, MYRLTE BEACH |
| HIGHTOWER | OH OK. OK |
| CARTER | IM GOING DOWN THERE CHILLING AND SHIT |

On June 8, 2016, MH called his girlfriend using another inmate's line and talked about his pending case. MH stated: "I don't know what he was doing. I really don't know what the fuck he was doing.   Ain't no telling."   She replied: "the sad thing is why he doing whatever in your car."   He girlfriend stated that she talked to "D" while he was driving the car, and that he lied

and said he was not driving it.   MH instructed her to get all his cars "under cover."   There are

multiple communications between MH's girlfriend and Mosley on June 10.   The Audi is finally

located at a garage connected with the girlfriend on August 9, 2016 and seized.   Sometime after

that date, Mosley stops using his 1533 phone.

**F.   IDENTIFICATION OF MOSLEY and KM**

Investigators identified Mosley as the user of the two critical numbers in contact with

Carter at the time of the murder (2650 and 1533).   His girlfriend, "KM," a government

employee testified in the grand jury about Mosley's initial interactions with law enforcement.

| 12/16/2016 | Mosley got anxious and paranoid when government subpoenas KM.   He paced all night. The night before her testimony, Mosley was incommunicado with KM.   At one point she texts him: "AND NOW I'm starting to hear things. What you do in the dark always come to the light" |
|---|---|
| 12/20/16 | KM testified in grand jury |
| 12/20/16 at 3:40 p.m. | Mosley searched "what is the federal grand jury job?" and "Baltimore Crime Matthew MH." |
| 12/21/2016 | KM called investigators to report that when she got home from GJ, Mosley questioned her and asked KM if there were any more witnesses there. Before she could answer Mosley volunteered he was contacted by the witness who told Cliff he had seen KM at court. The two men spoke about what was going on – but Mosley said he did not know anything about the case.   KM encouraged Mosley to speak to investigators but he said he would wait for them to come to him. Mosley said "I knew they would come" and that investigators would want to speak with him.   Mosley left the apartment shortly thereafter.   Mosley also told KM that he had swapped vehicles with "Fat's friend" Mosley gave the friend the Audi and the friend gave Mosley the Black X5 BMW truck while the friend drove the Audi to Myrtle Beach. Mosley said Fats (Matt) instructed him to allow "Fats friend" to use the car to go to Myrtle Beach. Mosley told KM he does not get along with Fats' friend.   She asked Mosley where he was on May 27.   Mosley said he was dropping his daughter off at school in the morning. KM pulled up the video of the murder from the TV reports and Mosley refused to review the footage. |
| 2/12/2018 | Agents called KM to ask follow-up questions. When asked if she was still in touch with Mosley, KM said they had the same relationship issues. Mosley keeps alot of things from her. He does not let her know too much of anything. Mosley saw the news in December about an arrest in the case.   She was not with Mosley when she saw the news. Mosley came to her and told her about it as well. KM recalled being happy that an arrest was made but Mosley was antsy |

| | and she asked him what was wrong.   Mosley responded that the arrest "did not mean that they were finished with the whole case." Mosley told KM he had to get a lawyer. |
|---|---|

### G.  MOSLEY STATEMENTS

Agents interviewed Mosley on December 23, 2016 (recorded) and Mosley testified twice in the grand jury.   He maintained he did not know anything about the murder and could not remember if or why the Audi was at the scene of the murder on May 27 – though eventually he recalled at some point transferring it to Carter so Carter could take it to Myrtle Beach but had no details about where or how he made the transfer.   To the extent Mosley refers directly to Carter in any of his statements, the government will make redactions and advise court and counsel. *See Bruton v. United States*, 391 U.S. 123 (1968)(a defendant's confrontation clause rights are violated when a non-testifying codefendant's confession naming the defendant as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider the confession only against the defendant); *Marsh v. Richardson,* 481 U.S. 200, 211 (1987)(If a non-testifying co-defendant's statement is redacted to eliminate any reference to the defendant such statement is admissible); *United States v. Vogt*, 910 F.2d 1184, 1191 (4th Cir.1990)(accepting practice of replacing the defendant's name by a symbol or neutral pronoun).   *See also United States v. Lighty,* 616 F.3d 321, 376 (4th Cir. 2010).   After ensuring there are no *Bruton* issues, the government may introduce the following statements made by Mosley.

1.   Recorded Statement

KM told him Mosley that her grand jury was about murder of a preacher or something. Mosley said he was not concerned but just like "what's going on – I didn't know what was going on."     Mosley conceded that "I ain't lying to you, MH took care of me, like a time I was broke he was took care of me…"     MH let him drive a couple of cars (naming a Lincoln, a black

BMW X5, a black Audi and a greyish blue Audi.   Mosley volunteered the Audi had European

Tags.   At some point, MH's girlfriend told him that MH wanted the Audi back.   Mosley was

mad b/c he needed the car.   Mosley paid Michelle's brother the insurance for the Audi.

Mosley admitted the 2650 number was his for a couple years and that it was in the name

of his deceased uncle.   Mosley lied that he "never used a phone in [his girlfriend's] name" and

never disclosed the 1533 number.   When an agent specifically asked about the 1533 number in

KM's name and Mosley responded, "What number is that?"   Mosley said he did not know any

of his phone numbers.

Mosley admitted he know where Rosalind Avenue is (the scene of the Ashburne murder)

because he "used to live on Virginia Avenue."   Mosley claimed to have heard about the murder

because his "girlfriend just told me."   Mosley admitted he had no reason to be around Rosalind

Avenue and Virginia Avenue during Memorial Day weekend at 730 in the morning but that he

was around "Wylie" all the time – referring to a nearby street.   Mosley said he wakes up in the

morning when his girlfriend does around 6 a.m.   He gets dressed and make his "moves."

Mosley said he had no reason to be around Rosalind Ave at 8 a.m. in the morning.     When he

goes to Wylie Ave location, he "parks anywhere within walking distance."

Mosley said when his girlfriend came home from grand jury and they talked, "I wasn't

worried though – what the fuck."    He falsely denied talking to others in the grand jury.

2.   Grand Jury Testimony

During his two grand jury appearances, Mosley admitted he "hustles", or sells marijuana to make

a living.   Though his statements/confession is clearly relevant as to Count Ten (Drug

distribution), more significant it is relevant to the witness murder counts because Mosley first

told investigators this explanation for why he was in the area of Rosalind during the early

morning hours of May 27, when Ms. Ashburne was murdered.   Even more significant, his

statements to this end are completely opposite to what he told his girlfriend in terms of his whereabouts the morning of the murder.

After advisement of his rights, Mosley testified about drug dealing during his January 2017 as follows. These are not the only excerpts reference his involvement in drug distribution but are important examples.

When asked about the area of "Wylie" where he hung out, Mosley stated (at page 9):

```
 3   I'm using your phrase, and I don't mean to be facetious about
 4   it but where you hustle?
 5       A.   Yes.
 6       Q.   And that's what you -- that's the word that you used,
 7   correct?
 8       A.   Yeah.
 9       Q.   And so that area --
10       A.   But not no poison.
11       Q.   Pardon me?
12       A.   Not no poison.
13       Q.   Poison?
14       A.   I'm just saying.
15       Q.   Oh, you don't sell heroin?
16       A.   I don't sell no cocaine or heroin, none of that, no
17   poison.
18       Q.   You just sell marijuana?
19       A.   Sometimes.
20       Q.   And that's something you've been doing for years in
21   that area?
22       A.   Really, it hasn't been years.
23       Q.   Well, how long?
24       A.   I'm going to say about -- I'd say about a year and a
25   half or something like that.
```

When asked about his explanation for his car arriving near the scene of the homicide early in the morning on May 27, Mosley stated (at page 70)

> Q.   And my question to you was:  Do you have any recollection early in the morning, 6 a.m., 7 a.m. -- because you don't work, right?  You weren't going to work, right?
>
> A.   I already told you what I do.
>
> Q.   Were you going to work that morning, Mr. Mosley?
>
> A.   I was going to hustle possibly.
>
> Q.   Which is your work.  You mean to sell drugs?
>
> A.   See, you make me look vicious when you say going to sell drugs.
>
> Q.   Let me ask you this way, Mr. Mosley, because I'm --
>
> A.   You make me look vicious.  These people --
>
> Q.   When you say you were going to hustle at 6 a.m. in the morning, what did that mean?
>
> A.   Probably going, you know, put something together.
>
> Q.   What does that mean?
>
> A.   Some marijuana or just -- you know, I get up early to make something happen.  I don't -- sometimes I don't even know how to make money.  But like I say, if I'm outside and I'm like -- I'm there somewhere and I can make it happen.

As is readily apparent, Mosley's admissions of drug distribution is intertwined with his false and varying explanations of his whereabouts and the reasons for his whereabouts on May 27.   Mosley told his girlfriend that he left the house early on May 27 he left the house to take his daughter to school.   This is a provable lie. His grand jury testimony is clearly admissible against him in the murder case standing alone.

In addition, Mosley admitted to being in MH's black BMW Memorial Day weekend. This is the same BMW Carter was arrested in on June 1, when agents recovered pounds of

marijuana and cash.   The government briefed the connection between the marijuana and MH in its Consolidated Response to Carter's motions.   Simply put, marijuana sales are naturally part of the interrelationship between MH, Carter and Mosley.     Indeed, on June 4, 2016, Mosley even texts Carter, "Yo got some tree (common slang for marijuana) or not I need to get high."

## IV.     MOTION TO SEVER

Like Carter (ECF 40), Mosley has moved to sever the drug count (Count Ten) from the murder counts and his entire case from Carter's.   To prevail on his severance motion, Carter must demonstrate either that joinder is improper under Federal Rule of Criminal Procedure 8(a) or that the court should sever the counts under Rule 14(a), despite the propriety of joinder. The Government will address both in turn.

### A.   Joinder of Counts

Fed.R.Crim.P 8(a) provides that the indictment may charge a defendant in separate counts with two or more offenses if [1] the offenses charged are of the same or similar character, [2] are based on the same act or transaction, or [3] are connected with or constitute parts of a common scheme or plan."   "[J]oinder is the 'rule rather than the exception." *United States v. Hawkins,* 776 F.3d 200, 206 (4th Cir. 2009) (citation omitted).   The government is relying here on subparagraph (3).

In *United States v. Cardwell*, 433 F.3d 378, 385 (4th Cir.2005), the Court recognized that "Rule 8(a) 'permit[s] very broad joinder' " because it creates "efficiency in trying the defendant on related counts in the same trial."   *See also United States v. Mir*, 525 F.3d 351, 356–57 (4th Cir. 2008).   This is particularly so where evidence of one charge would be admissible in a case involving the other.   *See United States v. Branch*, 537 F.3d 328, 341 (4th Cir. 2008); *United States v. Jamar*, 561 F.2d 1103, 1106–07 (4th Cir. 1977) (noting that "if the evidence of all the joined crimes would be mutually admissible for legitimate purposes in separate trials for each

18

offense (assuming no joinder), the possibilities of prejudice from the fact of joinder no longer present themselves so forcefully").

The offenses are "connected with or constitute parts of a common scheme or plan" because Mosley's grand jury testimony confessing to marijuana sales is a false explanation regarding his whereabouts the morning of May 27.   The Fourth Circuit interprets this prong of Rule 8(a) "flexibly, requiring that the joined offenses have a 'logical relationship' to one another."   *Cardwell*, 433 F.3d at 385 (*citing United States v. Hirschfeld*, 964 F.2d 318, 323 (4th Cir.1992)).   Obviously, there is also a temporal relationship here and though a "mere temporal relationship" alone is not sufficient to show that two crimes are logically related, that fact, combined with additional evidence, may provide the required link if "a factfinder [can] infer" the "logical connection between the two counts."   *Cardwell*, 433 F.3d at 387.   The Fourth Circuit has explained that, "[i]n determining whether two offenses are connected with or constitute parts of a common scheme or plan for purposes of Rule 8(a), we have read the rule 'flexibly' to require simply a 'logical relationship' between offenses charged in the indictment." *United States v. Blair*, 661 F.3d 755, 769 (4th Cir. 2011)(citation omitted).

Mosley's false explanations of his whereabouts on May 27, his use and possession of various cars belonging to MH (the silver Audi and the black BMW), and his criminal relationship with Carter (and connection to MH's black BMW where the marijuana was recovered) are all necessary aspects of the government's proof.   This is true regarding both the drug counts <u>and</u>, more importantly, the relationship between Carter, Mosley and MH.   Based on the logical and factual connection between the marijuana and the murder, and the "very broad joinder" requirements of Rule 8(a), joinder in this case is plainly proper.

B.  Joinder of Defendants

Individual defendants are properly joined for trial when they are alleged to have

participated in the "same series of acts or transactions constituting an offense or offenses," Fed. R. Crim. P. 8(b).   "There is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537 (1993) (citations omitted). Moreover, joinder of defendants "is highly favored in conspiracy cases, over and above the general disposition supporting joinder for reasons of efficiency and judicial economy." *United States v. Dinkins*, 691 F.3d 358, 368 (4th Cir. 2012) (citation omitted). The Fourth Circuit therefore generally "adhere[s] to the rule that defendants charged with participation in the same conspiracy are to be tried jointly." *United States v. Akinkoye*, 185 F.3d 192, 197 (4th Cir. 1999). General protestations aside, the Court should deny Mosley's half-hearted request to sever his case from Carter.   The only substantive issue, discussed *supra.*, relates to *Bruton* and Mosley's various statements about Carter but the government intends to redact any statements made in consistent with the Supreme Court's ruling.

   C.  Severance

   Rule 14 of the Federal Rules of Criminal Procedure ("Relief from Prejudicial Joinder") provides in pertinent part: "If the joinder of offenses or defendants in an indictment…appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."   Under Rule 14, the court has discretion to require a severance if the defendant establishes that actual prejudice would result from a single trial.   *Blair*, 661 F.3d at 770 (emphasis supplied).   In other words, a severance under Rule 14 is proper "only if there is a serious risk that a joint trial would ... prevent the jury from making a reliable judgment about guilt or innocence."   *Zafiro,* 506 U.S. at 539.   A defendant who moves for severance under Rule 14 has the burden of demonstrating "a strong showing of prejudice." *United States v. Goldman*, 750 F.2d 1221, 1225 (4th Cir. 1984).   "It is a "daunting task" to demonstrate such a serious risk.   *Blair*, 661 F.3d at 770.   Severance is not

appropriate merely because it might improve the defendant's chances for an acquittal. *Id.*
Rather, "[t]here must be such a stark contrast presented by the defenses that the jury is presented
with the proposition that to believe the core of one defense it must disbelieve the core of the
other...." *United States v. Najjar*, 300 F.3d 466, 474 (4th Cir. 2002).   Finally, the trial judge
must balance the interest in judicial economy against the risk of prejudice to the defendant.
*Zafiro,* 506 U.S. at 539.

     In *Goldman,* 750 F.2d at 1224, the Fourth Circuit identified "three sources of prejudice"
that may justify the granting of a severance under Rule 14.   First, the jury may confuse and
cumulate the evidence, and convict the defendant of one or both crimes when it would not
convict him of either if they could keep the evidence properly segregated.   The crimes here are
separate and distinct and the court would properly instruct about the proof required to convict the
defendant beyond a reasonable doubt of each.

     The second source of prejudice is that the defendant may be "confounded" in presenting
defenses.   *Goldman*, 750 F.2d at 1225.   As the court explained:

>     In making such a showing, it is essential that the defendant present enough
>     information—regarding the nature of the testimony he wishes to give on one
>     count and his reasons for not wishing to testify on the other—to satisfy the court
>     that the claim of prejudice is genuine and to enable it intelligently to weigh the
>     considerations of 'economy and expedition in judicial administration' against the
>     defendant's interest in having a free choice with respect to testifying.

*Id*. (citation omitted).   When coupled with his criminal history and the evidence of numerous
false statements he has made to witnesses and law enforcement in this case, the scenario is
highly unlikely; nor has he alleged such.   Indeed, Mosley confessed to the marijuana in the same
statements the government will introduce to prove his knowledge of certain facts, his admissions
of others, as well as false exculpatory statements he made.

     The third source of prejudice is that the jury may conclude that the defendant is guilty of

one crime and then find him guilty of the other because of his criminal disposition.   *Id. citing United States v. Foutz*, 540 F.2d 733, 736 (4th Cir. 1976)).   In analyzing the prejudice component, the court must consider whether, if there were a severance, evidence under one of the severed counts would probably be admissible at a trial on the other count.   Like Carter, Mosley also fails woefully in his boilerplate motion.   He has not shown that the evidence as to drug distribution would be inadmissible at a separate trial as to the witness murder counts.   Nor could he.   His confession is his false alibi.

While there may be some degree of bias in a joint trial, the Fourth Circuit has held that limiting instructions coupled with reliance on the jury's ability to follow such instructions and compartmentalize proof regarding multiple charges adequately addresses that concern. *Cardwell*, 433 F.3d at 388.   Since juries are presumed to follow their instructions, see *Zafiro*, 506 U.S. at 540, and the charges are rather straight forward, such instructions will effectively deal with potential prejudice inferred between the six counts.   A limiting instruction regarding to the jury requiring them to consider each count separately should suffice.   The charges are properly joined and the motion to sever should be denied.

Mosley has not indicated how he would be adversely affected by way of a joint trial. A conclusory assertion of unfairness fails to satisfy his burden of demonstrating a strong showing of prejudice.   Any potential for prejudice can be addressed by a cautionary instruction. *See, e.g., Blair*, 661 F.3d at 770 (finding no prejudice where court issued a limiting instruction). He has cited no authority for the proposition that a jury would be unduly prejudiced such as to convict a man of murder who also admitted to distributing marijuana.   That is plainly illogical and the Court would instruct the jury otherwise.

In conclusion, a joint trial of the witness murder and drug counts is warranted by the specific facts of this case, as is the conspiracy against the defendants. It is well within the court's

absolute discretion to try these charges and defendants in one trial.

**CONCLUSION**

The Court should deny Carter's Motion to Sever.

Respectfully submitted,

Robert K. Hur
United States Attorney

By:     _____/s/_____
Sandra Wilkinson
Judson T. Mihok
Assistant United States Attorneys

I hereby certify that I caused a true and correct copy of the Government's Response to Defendant Mosley's Motion to Sever to be e-filed on July 29, 2019 and served on defense counsel.

\_\_\_/s/_____
AUSA Sandra Wilkinson